UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SENARBLE CAMPBELL, | No. 2:18-cv-00671-CKD |
| Plaintiff, | |
| v. | ORDER |
| JOSHUA J. TANTON, et al., | |
| Defendants. | |

Plaintiff is a state prisoner proceeding through appointed counsel in this civil rights action filed pursuant to 42 U.S.C. § 1983. This case is proceeding on plaintiff's third amended complaint alleging Eighth Amendment deliberate indifference claims against defendants Becerra, Martin, Kenton, and Herrera; excessive force claims against defendants Tanton, Hammer, Pierce, Rashev, and Leech; a failure to protect claim against defendant Ellin; and, state law medical negligence claims against defendants Martin and Kenton. Defendants Becerra, Martin, Kenton, Herrera, and Pierce filed a motion for summary judgment that is now before the court. ECF No. 162. The motion has been fully briefed. ECF Nos. 166-169. Oral argument was heard on March 20, 2024. ECF No. 171. For the reasons that follow, defendants' motion is granted in part and denied in part.

/////

/////

1

### I. Summary Judgment Standards Under Rule 56

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record…." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of their pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists or shows that the materials cited by the movant do not establish the absence of a genuine dispute. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987). In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

**II.     Allegations in the Third Amended Complaint**

Following his transfer to California State Prison-Sacramento ("CSP-Sac") and his referral to mental health services, plaintiff was interviewed several times by defendant Becerra, who was a clinical social worker. ECF No. 147 at 3-4. Defendant Becerra conducted a suicide risk evaluation of plaintiff on June 16, 2015 in which plaintiff told him of his history of multiple suicide attempts "by hanging, overdose, self-injury, and in 2008 setting a fire in his cell." ECF No. 147 at 5. Despite this information, defendant Becerra indicated that plaintiff was a "moderate chronic risk and a low acute risk for suicide" and he did not recommend placing plaintiff in a higher level of mental health treatment. Id.

On June 19, 2015, plaintiff boarded up his cell window in an attempt to commit "suicide by cop" which led to his cell extraction by a group of correctional officers, some of whom are named defendants in this action.[1] After being removed from his cell by force and treated for his injuries, plaintiff was placed on suicide observation and interviewed by defendant Becerra who

---

[1] The allegations concerning this cell extraction are not included as there is no pending summary judgment motion by defendants Tanton and Ellin concerning the Eighth Amendment excessive force and failure to protect claims stemming from this incident.

described plaintiff as homicidal rather than suicidal. Id. at 6.

The next day, defendant Martin, who was a psychologist, conducted a suicide risk evaluation of plaintiff who told him that he continued to feel suicidal and had attempted suicide by cop a day earlier. Id. at 7. Defendant Martin removed plaintiff from suicide watch, denied him access to a Mental Health Crisis Bed ("MHCB") and released him back to regular housing. Id.

After being returned to regular housing that same day, plaintiff was still suicidal and, once again, papered over his cell windows. Id. at 7. Plaintiff was forcibly extracted from his cell resulting in a laceration to his head.[2] Id. at 7-8.

After being placed on suicide observation a second time, plaintiff was seen by defendant Kenton, who was a psychologist, on June 21, 2015. Id. at 8. Defendant Kenton performed a suicide risk evaluation of plaintiff who indicated that he felt suicidal and had attempted suicide by cop. Id. Defendant Kenton concluded that plaintiff was a low risk of suicide, removed suicide precautions, and released him back to regular housing. Id.

On June 24, 2015, plaintiff boarded up his cell a third time and was once again forcibly extracted from his cell, this time with the use of pepper spray. ECF No. 147 at 8. Plaintiff was transferred to a MHCB where he remained until July 5, 2015. Id. at 8-9.

Plaintiff was escorted in handcuffs from the shower back to his regular cell by defendants Pierce and Rashev on August 22, 2015. ECF No. 147 at 9-10. Earlier that day plaintiff was seen by a doctor for a blister on his foot and was told to wear his shower shoes inside his cell in order to keep the foot clean. Id. at 9. When defendants Pierce and Rashev ordered plaintiff to remove his shower shoes before entering his cell, plaintiff protested. Id. at 10. "Defendants Rashev and Pierce immediately slammed him into the concrete floor, despite the fact that he was already in restraints." Id. Plaintiff sustained injuries to his left cheek and eye and lacerations to his hands as a result of this use of force. Id.

---

[2] The allegations concerning this cell extraction are not included as there is no pending summary judgment motion by defendant Hammer concerning the Eighth Amendment excessive force claim stemming from this incident.

On October 20, 2015, defendant Herrera, who was employed as a Psychiatric Technician, was passing out medication to plaintiff. ECF No. 147 at 10. Plaintiff not only refused his medication, but he also reported feeling suicidal to defendant Herrera. Id. "Herrera continued to distribute medications to other inmates and did not obtain or even seek any additional medical or psychiatric assistance for Mr. Campbell." Id. Defendant Herrera failed to notify any medical staff of plaintiff's report of being suicidal. Id. Later that evening, plaintiff resorted to boarding up his cell again and was forcibly extracted. Id.

### III.     Defendants' Motion for Summary Judgment

#### A. Eighth Amendment Deliberate Indifference Claims against Defendants Becerra, Martin, Kenton & Herrera

For the purpose of summary judgment, defendants do not dispute that plaintiff had a serious medical need based on "a risk of harm arising from his suicidal ideation." ECF No. 162 at 13. Thus, the only question is whether there is a genuine issue of material dispute that defendants engaged in a purposeful act or failure to respond to this medical need resulting in harm to plaintiff. See Jett v. Penner, 439 F.3d at 1096 (citing McGuckin, 974 F.2d at 1060)).

In their motion for summary judgment, defendants Becerra, Martin and Kenton argue that the undisputed facts demonstrate that they were not deliberately indifferent to plaintiff's mental health needs because they addressed his symptoms and complaints during their mental health assessments of plaintiff. These defendants contend that plaintiff cannot meet his burden of demonstrating that their chosen course of mental health treatment was done in conscious disregard of an excessive risk to plaintiff's health. The medical defendants additionally assert that they are entitled to qualified immunity because their actions were not clearly unconstitutional when they occurred in 2015. ECF No. 162 at 23.

#### B. Excessive Force Claim against Defendant Pierce

According to defendant Pierce, the force he applied was used in a good-faith effort to restore discipline and not maliciously and sadistically to cause plaintiff harm. Hudson v. McMillan, 475 U..S. 312, 319 (1986). Even plaintiff's own account of the incident indicates that defendant Rashev was the officer who slammed him to the ground and not defendant Pierce. ECF

5

No. 162 at 21. Thus, there is no genuine issue in dispute about whether defendant Pierce used excessive force. ECF No. 162 at 20-21. Furthermore, a reasonable officer in defendant Pierce's position would not have believed his actions were clearly unconstitutional thus entitling him to qualified immunity.

### IV. Plaintiff's Opposition to Summary Judgment

#### A. Deliberate Indifference Claims

First, with respect to the evidence tendered in support of summary judgment, plaintiff requests that the court strike defendant Kenton's declaration "as a sham" because she had no recollection of the events during her deposition which was made earlier in time than her declaration in which she is able to recount events in detail. ECF No. 166 at 2-3.

On the merits of the motion, plaintiff relies almost exclusively on his retained medical expert, Dr. Celosse, to create a genuine issue of material dispute on the Eighth Amendment deliberate indifference claims against the medical defendants. ECF No. 166 at 2. "The evidence establishes that Campbell's need for elevated levels of suicide prevention and treatment constituted a serious medical need and that the failure to treat his condition could and did result in further harm to Campbell. Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). It also led to the unnecessary and wanton infliction of pain due to the cell extractions suffered by Campbell." ECF No. 166 at 2.

In arguing that the medical defendants are not entitled to qualified immunity, plaintiff relies on Clouthier v. County of Contra Costa, 591 F.3d 1232, 1245 (9th Cir. 2010), overruled on other grounds by Castro v. County of Los Angeles, 833 F.3d 1060 (9th Cir. 2016) (en banc), which held that "a reasonable mental health professional could not have thought it was lawful to remove key suicide prevention measures put in place by a prior Mental Health staff member" when treating a mentally ill prisoner in 2005. ECF No. 166 at 4.

#### B. Excessive Force Claim

In order to establish a legitimate factual dispute, plaintiff relies on CDCR records rather than his own recollection of the use of force incident by defendant Pierce. ECF No. 166 at 2-3. "Viewing the evidence objectively, a jury could infer that Pierce took part in a violent and

punitive take down of Campbell that caused injury." ECF No. 166 at 4.  Moreover, defendant Pierce is not entitled to qualified immunity.

### IV. Defendants' Reply (ECF No. 168)

#### A. Deliberate Indifference Claims

By way of reply, defendants assert that plaintiff's expert medical opinion does not raise a genuine issue on the Eighth Amendment deliberate indifference claims because it only establishes a difference of opinion that does not rise to the level of a constitutional violation.  ECF No. 168 at 3-5.  With respect to the discrepancies between defendant Kenton's declaration and her deposition testimony, defendants point out that the "declaration describes her encounter with Plaintiff based on her review of the medical records… rather than on personal recollection…."  ECF No. 168 at 5.  Therefore, defendant Kenton did not manufacture any facts to obtain summary judgment as plaintiff suggests.  Id.

On the issue of qualified immunity, defendants point out that plaintiff only addresses one out of the three cases cited in the motion for summary judgment demonstrating that the law did not clearly establish defendants conduct to be unconstitutional as of 2015.  ECF No. 168 at 6.  Merely citing broad constitutional principles is not sufficient to rebut defendants' context-specific qualified immunity analysis.  ECF No. 168 at 7.  "This shows that the rights Plaintiff seeks to enforce against Defendants was not clearly established at that time."  ECF No. 168 at 7.

#### B. Excessive Force Claim

With respect to the excessive force claim against defendant Pierce, plaintiff's own deposition testimony does not raise a triable issue because he indicates that Pierce did not use any force against him.  ECF No. 168 at 5.  Furthermore, defendants point out that qualified immunity is a question of law that is for the court and not the jury to decide.  ECF No. 168 at 9.

/////
/////
/////
/////
/////

7

V.  **Undisputed Material Facts**[3]

A.  **Deliberate Indifference Claims**

   1.  **Defendant Becerra**

Defendant Becerra, an Associate Clinical Social Worker at CSP-Sac, interviewed plaintiff on **June 5, 2015**. Defendants' Statement of Undisputed Facts ("DSUF") at ¶ 2. During this initial interview, defendant Becerra informed plaintiff that he was his new primary clinician and that he would see plaintiff the following week. DSUF at ¶ 2.

On **June 11, 2015**, Becerra interviewed plaintiff again to build rapport with plaintiff and to create treatment goals. DSUF at ¶ 3. According to Becerra's Progress Notes, plaintiff reported that his mood was "fine." DSUF at ¶ 3; ECF No. 162-5 (Interdisciplinary Progress Notes). Plaintiff disputes this and indicates that his mood was depressed. Plaintiff's Response to Defendants' Statement of Undisputed Facts ("PRDSUF") at ¶ 3.

Becerra next interviewed plaintiff and completed a suicide risk evaluation of him on **June 16, 2015.** DSUF at ¶ 4. During this suicide risk assessment, Becerra noted that plaintiff did not report a plan to kill himself or a desire to die. DSUF at ¶ 4. Using the numerous risk factors on the suicide risk evaluation form, Becerra estimated plaintiff to be at a moderate chronic risk and a low acute risk of suicide. Id. Plaintiff indicated that he did not want to share his mental health symptoms with Becerra, but the progress notes indicate that plaintiff stated his mood was "alright." Id. Plaintiff disputes this description of his mood and, instead, indicates that he was depressed. PRDSUF at ¶ 4. Becerra's treatment goals for plaintiff were listed as implementing new coping strategies to help manage his depressive symptoms, avoiding impulsive behaviors, and eliminating one acute suicide risk factor by his next suicide risk evaluation. DSUF at ¶ 4.

On **June 17, 2015**, Becerra participated in a meeting of plaintiff's Interdisciplinary Treatment Team ("IDTT") which resulted in the completion of a 7 page mental health treatment plan for plaintiff. DSUF at ¶ 5; ECF No. 162-5 at 14-20 (CDCR MH-7388). This treatment plan included short-term goals and objectives for plaintiff as well as criteria for him to meet before

---

[3] The facts are undisputed unless otherwise noted.

8

1   being discharged from the Extended Outpatient (EOP) level of mental health care. DSUF at ¶ 5.
2   This IDTT treatment plan also identified plaintiff's problems as depression, impulsivity, and
3   suicidal ideation with intermittent suicidal ideation reported by plaintiff over the last 90 days.
4   PRDSUF at ¶ 5.
5       On **June 23, 2015**, Becerra interviewed plaintiff again. DSUF at ¶ 10. According to
6   Becerra's Progress Notes, plaintiff reported that his mood was "okay." ECF No. 162-5 at 22.
7   Plaintiff disputes this, but he is unable to recall what specifically he said during this encounter
8   because "there were so many incidents so close together." Plaintiff's Deposition at 39, 9-10.
9   Becerra noted that plaintiff was agitated and did not want to share his mental health symptoms
10  with him because a rapport had not been established. DSUF at ¶ 10. Becerra developed
11  treatment goals for plaintiff that included implementing 3 new coping strategies to manage his
12  depressive symptoms, avoiding impulsive behavior, and changing one acute suicide risk factor to
13  a "no" on his next suicide risk assessment. DSUF at ¶ 10.
14      Becerra conducted another suicide risk assessment of plaintiff the next day, on **June 24,**
15  **2015,** while plaintiff was in a holding cell after plaintiff boarded up his cell window and was
16  forcibly extracted. DSUF at ¶ 11. Plaintiff did not talk or answer any of Becerra's questions
17  because plaintiff was in an angry mood. DSUF at ¶ 11. Becerra noted that plaintiff did not report
18  a plan to kill himself or a desire to die. Id. Plaintiff does not dispute that portion of the suicide
19  risk assessment but argues that it is completely inconsistent with plaintiff's lack of
20  communication. PRDSUF at ¶ 11. Based on the numerous risk factors on the evaluation form,
21  Becerra estimated that plaintiff was a moderate chronic risk and a low acute risk for suicide.
22  DSUF at ¶ 11. Becerra placed plaintiff in a MHCB with the same treatment goals and
23  encouraged him to calm his anger by using relaxation techniques and sharing his feelings with
24  him as his primary clinician. DSUF at ¶ 11.
25      On July 21, 2015, Becerra interviewed plaintiff again. DSUF at ¶ 12. According to the
26  progress notes, plaintiff stated that his mood was "[n]ot good," that he had not received his
27  property, and had not been allowed to go to groups. DSUF at ¶ 12. Plaintiff indicated that
28  custody officers were "playing games" with him. Id. He wanted Becerra to tell custody staff that

9

he was suicidal, he was not going to leave his cell, and that they would have to try and extract him. Id.

On August 19, 2015, Becerra spoke with plaintiff and participated in an IDTT meeting as plaintiff's primary clinician. DSUF at ¶ 13. Plaintiff stated that he was "fucking pissed off" and that he wanted another clinician because he did not feel that Becerra was listening to his mental health needs. DSUF at ¶ 13. Plaintiff wanted to go back to his cell and again reiterated that custody officers were going to have to forcibly extract him in order to move him to a holding cell. Id. Plaintiff's history of cell extractions and three disciplinary convictions for battery on a correctional officer in the prior 90 days were both noted in Becerra's assessment. Id. The IDTT completed a Mental Health Treatment Plan form for plaintiff. DSUF at ¶ 13; ECF No. 162-5 at 33-39. Plaintiff was once again admitted into a MHCB. DSUF at ¶ 13.

The parties dispute whether defendant Becerra provided plaintiff with appropriate mental health care and treatment for his suicidal ideation. According to plaintiff's mental health expert, Becerra failed to conduct thorough suicide risk assessments and did not provide adequate treatment plans that were consistent with national standards of mental health care. ECF No. 166-3 at 13 (Celosse Report). Dr. Celosse also indicates that Becerra did not properly identify several known suicide risk factors during the June 16, 2015 assessment and that he ignored obvious signs of plaintiff's mental decompensation during the June 24, 2015 suicide risk assessment. ECF No. 166-3 at 20-21. This placed plaintiff at an increased risk of suicide. Id.

### 2. Defendant Martin

At 5:30 a.m. on **June 20, 2015**, defendant Martin, employed as a psychologist clinician at CSP-Sac, completed a suicide risk evaluation of plaintiff after being informed that he had reported feeling suicidal the previous evening. DSUF at ¶ 6; ECF No. 162-4 at 4-5 (CDCR MH-7447). During this evaluation, plaintiff told Martin that he had been feeling suicidal the previous day when he boarded up his cell resulting in the use of force by correctional officers to remove him from his cell. DSUF at ¶ 6. The records that Martin reviewed indicated that this was a consistent account. DSUF at ¶ 6. Plaintiff indicates that he told Martin that he was still suicidal. PRDSUF at ¶ 6 (Plaintiff's Deposition at 88).

According to Martin, plaintiff presented as stable, denied being suicidal or having intentions to harm himself, and was not an imminent risk of harming himself or others. ECF No. 162-4 at ¶ 3 (Declaration of F. Martin). Based on this encounter, Martin decided to discontinue plaintiff's suicide precautions; to rescind his Mental Health Crisis Bed (MHCB) placement; to return him to regular housing; and, to order a five-day follow up with mental health. DSUF at ¶ 6. This determination was based on Martin's professional judgment in accordance with the information plaintiff provided to him and the records he reviewed. DSUF at ¶ 6.

The parties dispute whether this was appropriate mental health care and treatment. According to plaintiff's mental health expert, "Defendant Martin's documentation, diagnosis, and treatment of Plaintiff Campbell failed to comport with best practices and fell below the standard of care." ECF No. 166-3 at 23 (Celosse Report). Best practices would have required defendant Martin to continue plaintiff's suicide watch and refer him to a MHCB. ECF No. 166-3 at 23.

### 3. Defendant Kenton

At 5:30 a.m. on **June 21, 2015**, defendant Kenton, who was employed as a psychologist clinician at CSP-Sac, completed a suicide risk assessment of plaintiff. DSUF at ¶ 8. This assessment was conducted after Kenton was notified that plaintiff had reported suicidal ideation. DSUF at ¶ 8. According to Kenton, plaintiff refused to speak during this assessment. ECF No. 162-6 at ¶ 3 (Kenton Declaration). Plaintiff indicates that he told Kenton that he felt suicidal and that he was specifically "suicidal by cops." Plaintiff's Deposition, at 110. Plaintiff showed Kenton his two head wounds received after becoming suicidal by cop on separate occasions and being extracted by force from his cell. Id.

Kenton also reviewed plaintiff's mental health records from the previous day which included defendant Martin's suicide risk assessment. ECF No. 162-6 at ¶ 3. Kenton relied upon this information as part of her suicide risk assessment of plaintiff. DSUF at ¶ 8.

Based on her professional judgment, Kenton discontinued plaintiff's suicide precautions, rescinded his Mental Health Crisis Bed ("MHCB") housing placement, ordered plaintiff returned to regular housing with a five-day follow-up with mental health services for suicide protocol care. ECF No. 162-6 at ¶ 3.

The parties dispute whether this was appropriate mental health care and treatment. According to plaintiff's mental health expert, Dr. Celosse, the documentation, treatment, and diagnosis of plaintiff's suicide risk was inconsistent with best practices and fell well below the standard of care for a licensed psychologist. ECF No. 166-3 at 24 (Celosse Report).

### 4. Defendant Herrera

On **October 20, 2015**, Psychiatric Technician Herrera made a medication pass in plaintiff's housing unit which consisted of distributing medication to inmates at their cells. DSUF at ¶ 17. For these medication passes at least one custody officer accompanied Herrera. DSUF at ¶ 19.

During this medication pass, plaintiff informed Herrera that he was feeling suicidal. Plaintiff's Deposition, at 143, lines 9-10. Defendant Herrera disputes this and indicates that if plaintiff had reported feeling suicidal, he would have notified the custody staff working in the housing unit. ECF No. 162-2 at ¶ 4 (Herrera Declaration). According to defendant Herrera, it is custody staff's responsibility to notify the prison medical or mental health care staff. Id. He further contends that there was no practice or policy requiring him to notify anyone when an inmate reported feeling suicidal during medication passes. Id. According to Dr. Celosse, defendant Herrera failed to follow best practices for mental health care and violated CDCR policy by not reporting plaintiff's suicidal ideation to medical staff. ECF No. 166-3 at 25.

Plaintiff also refused to take his Lithium Carbonate medication during the October 20, 2015 medication pass. DSUF at ¶ 17. Although defendant Herrera has no recollection of this specific event, he documented it on plaintiff's Medication Administration Record ("MAR"). DSUF at ¶ 17-18; ECF No. 162-2 at 5-6 (MAR).

According to defendant Herrera, the MAR allows medical or mental health staff to confirm whether or not an inmate is medication compliant and there was no requirement, practice, or policy to notify anyone that plaintiff refused his medication. ECF No. 162-2 at ¶ 3. Dr. Celosse is of the opinion that defendant Herrera had the duty to notify the psychiatrist about plaintiff's refusal to take his Lithium. ECF No. 166-3 at 4-5.

/////

### B. Excessive Force Claim against Defendant Pierce

On August 22, 2015, plaintiff was escorted from the shower back to his cell by defendants Pierce and Rashev. DSUF at ¶ 15. According to Pierce, plaintiff became agitated when defendant ordered him to surrender his shoes before entering his cell. DSUF at ¶ 15. Plaintiff indicates that they were engaged in a "back and forth" about whether plaintiff's doctor authorized him to have his shoes inside the cell. Plaintiff's Response to DSUF at ¶ 15. The parties further dispute which defendant had physical control over plaintiff during the escort. Defendant Pierce indicates that Rashev had physical control of plaintiff during the escort, while plaintiff indicates that "Officer C. Pierce had a grip with two hands on the inmates left arm and Officer P. Rashev had a grip with both hands on the inmate's right arm." DSUF at ¶ 15; PSSDUF at ¶ 22. When defendant Pierce gave plaintiff a second order to remove his shoes, plaintiff turned towards him. DSUF at ¶ 15. Defendant Pierce interpreted this movement as a threat to his and Rashev's safety so he grabbed plaintiff's left upper arm with both of his hands and used his physical strength and body weight to force plaintiff to the ground with the assistance of defendant Rashev. DSUF at ¶ 15. This was the entirety of the physical force used by defendant Pierce during this incident. DSUF at ¶ 15. According to plaintiff, he was "slammed to the ground by CO Rashev" and "blacked out." PSSDUF at ¶ 24. According to defendant Pierce, he did not intend to harm plaintiff. DSUF at ¶ 15.

### VI. Legal Standards

### A. Deliberate Indifference

Denial or delay of medical care for a prisoner's serious medical needs may constitute a violation of the prisoner's Eighth and Fourteenth Amendment rights. Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). An individual is liable for such a violation only when the individual is deliberately indifferent to a prisoner's serious medical needs. Id.; see Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002); Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000).

In the Ninth Circuit, the test for deliberate indifference consists of two parts. Jett, 439 F.3d at 1096, citing McGuckin v. Smith, 974 F.2d 1050 (9th Cir. 1991), overruled on other

13

grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc). First, the plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Id., citing Estelle, 429 U.S. at 104. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. Jett, 439 F.3d at 1096. This second prong is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. Id. Under this standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). This "subjective approach" focuses only "on what a defendant's mental attitude actually was." Id. at 839.

A showing of merely negligent medical care is not enough to establish a constitutional violation. Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998), citing Estelle, 429 U.S. at 105-106. A difference of opinion about the proper course of treatment is not deliberate indifference, nor does a dispute between a prisoner and prison officials over the necessity for or extent of medical treatment amount to a constitutional violation. See, e.g., Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). Furthermore, mere delay of medical treatment, "without more, is insufficient to state a claim of deliberate medical indifference." Shapley v. Nev. Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). Where a prisoner alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay caused "significant harm and that Defendants should have known this to be the case." Hallett, 296 F.3d at 745-46; see McGuckin, 974 F.2d at 1060.

**B. Qualified Immunity**

"Government officials enjoy qualified immunity from civil damages unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In analyzing a qualified immunity defense, the court must consider the following: (1) whether the alleged facts, taken in the light most favorable to the

plaintiff, demonstrate that defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was clearly established at the time of the incident. Saucier v. Katz, 533 U.S. 194, 201 (2001).

### C. Excessive Force

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is… whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillan, 503 U.S. 1, 7 (1992). The court's inquiry into an excessive force claim focuses on the extent of the prisoner's injury, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. Hudson, 503 U.S. at 7 (1992) (quotation marks and citations omitted). While the absence of a serious injury is relevant to the Eighth Amendment inquiry, it does not end it. Hudson, 503 U.S. at 7. The malicious and sadistic use of force to cause harm always violates contemporary standards of decency in violation of the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 327 (1986).

### VII. Analysis

### A. Deliberate Indifference Claims

Turning first to plaintiff's request to strike defendant Kenton's affidavit as a sham, the court denies this request. Defendant Kenton's declaration merely describes the exact same information contained in the medical records which she completed during her evaluation of plaintiff in June 2015 which are attached to her declaration. The court does not adopt the malicious intent ascribed by plaintiff to the differences between defendant Kenton's deposition and her declaration. For these reasons, the request is denied.

Regarding the merits of the deliberate indifference claims, based on the contrary medical evidence provided by Dr. Celosse, there is a genuine issue of dispute whether defendants Becerra, Martin, Kenton, and Herrera purposefully failed to respond to plaintiff's serious mental health needs which resulted in harm. See Clouthier v. Cnty. of Contra Costa, 591 F.3d 1232 (9th Cir.

2010), overruled in part on other grounds by Castro, 833 F.3d at 1070 (holding that when a mental-health specialist was informed that a detainee was suicidal, had attempted suicide multiple times, and had been placed in a suicide smock by a staff member who warned that he needed to be "constantly monitored throughout the day to ensure his safety," a triable issue existed on whether she was deliberately indifferent to his mental-health needs by ordering him discharged from suicide monitoring and instructing officers to return his regular clothes and bedding, which he eventually used to commit suicide). Accordingly, the motion for summary judgment is denied on this basis.

### B. Qualified Immunity

These same defendants also move for summary judgment based on qualified immunity arguing that their actions were not clearly unconstitutional as of 2015. When defendants raise the issue of qualified immunity, it is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established. LSO, Ltd. v. Stroh, 205 F.3d 1146, 1157 (9th Cir. 2000) (citation omitted). In arguing that the medical defendants are not entitled to qualified immunity, plaintiff relies on Clouthier v. County of Contra Costa, 591 F.3d 1232, 1245 (9th Cir. 2010), overruled on other grounds by Castro v. County of Los Angeles, 833 F.3d 1060 (9th Cir. 2016) (en banc), which held that "a reasonable mental health professional could not have thought it was lawful to remove key suicide prevention measures put in place by a prior Mental Health staff member" when treating a mentally ill prisoner in 2005. ECF No. 166 at 4. The court finds that plaintiff has met his burden of demonstrating clearly established Eighth Amendment law as of 2015 when the events at issue occurred.

The majority of the case law upon which defendants rely to rebut Clothier does not concern the implementation of suicide protocols by medical professionals. See Taylor v. Barkes, 575 U.S. 822, 826 (2015) (finding state prison commissioner and warden were entitled to qualified immunity); Howell v. Tran, No. 15-cv-05377-SI, 2018 WL 1050155 at *9 (N.D. Cal. February 26, 2018) (granting summary judgment where a rational jury could not conclude that the correctional officer defendants were deliberately indifferent to plaintiff's mental health care needs). The only relevant case cited by defendants, Wang v. Cnty. of Santa Clara, No. 19-cv-

07997, 2020 WL 5893394 at * 6 (N.D. Cal. Oct. 5, 2020), found that Clothier did not involve similar circumstances where the inmate had no "notable" prior mental health history.  In light of plaintiff's undisputed serious mental health history prior to and during the time in which defendants provided him mental health treatment, the court rejects the argument that defendants Becerra, Martin, Kenton, and Herrera are entitled to qualified immunity.

### C. Excessive Force Claim Against Defendant Pierce

Turning to the claim against defendant Pierce, the court finds that there is no genuine issue of material dispute related to his use of force on August 22, 2015.  There is no evidence before the court that defendant acted maliciously and sadistically to cause plaintiff harm.  See Hudson, 503 U.S. at 7.  Although plaintiff argues that a jury could conclude that Pierce engaged in a "punitive take down," there is no evidence to support this conclusion.  As a result, defendant Pierce is entitled to summary judgment.[4]  Therefore, the motion for summary judgment is granted with respect to the excessive force claim against defendant Pierce.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment (ECF No. 162) is granted with respect to defendant Pierce and denied with respect to defendants Becerra, Martin, Kenton, and Herrera.

2. By separate order, this case will be referred to Magistrate Judge Stanley A. Boone for the purpose of conducting a settlement conference.

Dated:  April 21, 2024

_/s/ Carolyn K. Delaney_
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

12/camp0671.msj.consent

---

[4] In the interests of judicial economy, the court finds it unnecessary to address defendant Pierce's alternative argument that he is entitled to qualified immunity.